CLERK'S OFFICE U.S. DIST.
AT ROANOKE, VA
FILED

DEC 2 4 2014

JULIA C. DUDLEY, CLERK
BY: /s/ M. McG
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ALEXANDRA BELLOFATTO,                )
                                     )
        Plaintiff,                   )      Civil Action No. 7:14CV00167
                                     )
v.                                   )      **MEMORANDUM OPINION**
                                     )
RED ROBIN INTERNATIONAL, INC.,       )      Hon. Glen E. Conrad
                                     )      Chief United States District Judge
        Defendant.                   )

Plaintiff Alexandra Bellofatto filed this action against her former employer, Red Robin International, Inc. ("Red Robin"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA"). The case is presently before the court on Red Robin's motion for summary judgment. For the reasons set forth below, the motion will be denied.

## Factual Background

The following facts are presented in the light most favorable to Bellofatto. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

Bellofatto has Type I diabetes, juvenile onset, and is dependent on insulin. She must check her blood sugar levels throughout the day, and eat or drink at regular intervals to keep her blood sugar levels within their target range.

In May of 2012, after graduating from Radford University, Bellofatto was hired by Red Robin to work as a server at its Christiansburg, Virginia restaurant. She had previously worked at the restaurant chain's location in Columbia, Maryland.

During her interview at the Christiansburg restaurant, Bellofatto informed David Maranto, the general manager, that she had diabetes, and that she "need[ed] to be able to sit down and drink something or eat something really fast" if she experienced low blood sugar levels. Bellofatto Dep. 149.[1] Maranto indicated that this "would not be a problem." Id.; see also id. at 158 ("I even mentioned . . . [that] 'at my old Red Robin, they would just either give me a basket of fries or give me some bread and I'd go sit down in the back for a few minutes.' And [Maranto] was like, 'That's fair.'"). Bellofatto also shared this information with another manager, Matthew Pero, as well as her fellow servers.

Despite being told that it would not be a problem for her to take a quick break to eat or drink something to regulate her blood sugar levels, Bellofatto was frequently denied the opportunity to do so. During her deposition, Bellofatto testified that there were "many times" when her requests for breaks were either turned down or ignored, and that it "got to the point where [she] just did whatever [she] had to do so [she] didn't pass out." Id. at 206-08; see also id. at 151 ("There were times when I would just ask, like, 'Hey, I really needed to order something and eat something. Can I do that?' It didn't matter. It was, 'No, you've got tables. No, you need to get back on the floor. We'll phase you later. We'll deal with this later.'"); id. at 156 ("There were times I had low blood sugars and they wouldn't give me breaks."); id. at 165 ("It was just a passive/aggressive no and they would walk away."). Bellofatto testified that she would "get yelled at" when she stopped working without permission to "chug" a cup of soda, and that she "never got to just eat if [she] needed to just eat." Id. at 153, 208.

Bellofatto described one incident involving Pero that stuck out in her mind "like a sore thumb." Id. at 170. Specifically, on September 8, 2012, Pero refused to allow her to take a break

---

[1] At the court's request, Red Robin provided a copy of Bellofatto's entire deposition transcript following the summary judgment hearing. The transcript will be docketed and made a part of the record.

because she had not sold enough beverages during her shift:

> [T]here was one time I . . . asked Matt Pero[,] "Can I have a break? I have a double [shift]. I need to go eat something or I'm going to pass out." And he was, like, "Well, what was your bev PPA this morning?" And he looked at my bev PPA, which is an average of how much I had sold beverage-wise and it wasn't over a certain range that he wanted. So he just totally disregarded me and walked away. And when I asked again, he wasn't going to give me one. I didn't get one until the p.m. manager showed up that night.

Id. at 150; see also id. at 154 ("It was, 'Matt, I'm working a double. I'm having a low blood sugar. I need to go take a break. I need to eat. I'm going to pass out.' And he didn't care.").

Several days later, Pero made a note about Bellofatto's medical condition in the daily log. He stated that "any long shifts she has only end[] up with her in tears complaining about her blood sugar being too high or too low." Pero Dep. 108, Docket No. 43-4. Pero opined that Bellofatto was "not taking the proper steps" to control her diabetes, and suggested that management may "need to keep her to short volume only shifts." Id.

Bellofatto also claims that she and other young female servers were sexually harassed by a male server, Phillip Sellers, and that she began to personally experience such harassment in June of 2012, soon after she was hired. During her deposition, Bellofatto identified two instances of unwelcome physical contact that occurred that month. On the first occasion, Sellers came up to her from behind; grabbed her hair; and said, with his mouth close to her face, "'I bet you like it when your boyfriend pulls your hair [from behind].'" Bellofatto Dep. 124. Although Bellofatto "shot him a dirty look" and told Sellers not to touch her, he approached her again several days later and slapped her on the buttocks with a serving tray. Id. at 104, 124-25.

3

After the second incident, Bellofatto reported Sellers' behavior to Will Carico, an assistant kitchen manager.[2]  Carico advised her that he "had been continually . . . trying to talk to Maranto and other people in management about the Phil [Sellers] issue, and nothing was done about it." Id. at 104.  Bellofatto also complained to other managers about Sellers' conduct, but her complaints "just kind of got dismissed in general."  Id. at 112.

According to Bellofatto, Sellers continued to attempt to hug her and put his arm around her. Id. at 128.  In addition, Sellers called Bellofatto "sweetie or honey" instead of her name; told other employees that he and Bellofatto were dating; made comments about Bellofatto's appearance and "how lucky [her] man [was] to have [her]"; and suggested, "in a sexual manner," that he and Bellofatto "could work something out," when Bellofatto indicated that she was struggling financially.  Id. at 143; see also id. at 144 ("[T]he way he looked at me when he said those words, the body language that came across when he said those words, it was in a very sexual manner.").

Other female servers also complained of inappropriate behavior by Sellers.  In October of 2012, Kourtni Knobel called Red Robin's toll-free hotline and reported Sellers to human resources.  Knobel spoke to Kristy Boyd, an HR generalist, who made notes of their conversation. According to Boyd's notes, Knobel complained that Sellers would not stop asking her out on dates.  Knobel also indicated that she had complained to managers three times and that they claimed to have spoken to Sellers, but Sellers' misconduct continued.  Knobel advised Boyd that Sellers had told her that he would not be mad at her if she would hug him, and that she had heard

---

[2] At the time she was hired, Bellofatto received a copy of Red Robin's Team Member Handbook, which explains the company's anti-harassment policy and its open door policy for reporting harassment and discrimination.  The open door policy lists several options for reporting such conduct, including "[t]alking to your immediate supervisor or MOD (Manager on Duty)," speaking to the general manager, or calling the home office's toll-free phone number.  Def.'s Ex. 1, Docket No. 32-1.

4

Sellers comment on other women's bodies and express a willingness to "do" them.   Pl.'s Ex. 2, Docket No. 42.

Knobel provided Boyd with the names of some of her female coworkers, including Bellofatto and Tawny Vaught.   Boyd spoke to Tawny Vaught on October 19, 2012.   Vaught advised Boyd that her coworkers had complained about Sellers, and that Sellers had also said "inappropriate things" to her.   Id.   For instance, Sellers told Vaught that he would "sleep" with her, that he sometimes thought about her when he was having sex, and that he wanted to lay down and "taste" her.   Id.; see also Vaught Dep. 20, Docket No. 49-1.

Kristy Boyd spoke to Bellofatto on October 20, 2012.   With respect to Sellers, Bellofatto advised Boyd of the two incidents from the previous June, during which Sellers pulled Bellofatto's hair and hit her in the buttocks with a tray.   Bellofatto also reported that Sellers had made comments of a sexual nature, such as "your [boyfriend]'s lucky to have you," and "you['re] so sexy."   Pl.'s Ex. 2, Docket No. 42.   Bellofatto advised Boyd that she had complained to all of the managers, and that the managers had said that they would talk to Maranto.   Bellofatto also relayed incidents involving other women.   She told Boyd that Sellers had asked one female employee whether she was a virgin, and that he had told another female employee that he "want[ed] to lay down and taste [her]."   Id.

In addition to complaining about harassment by Sellers, Bellofatto advised Boyd that she was being discriminated against on the basis of her diabetes.   Bellofatto reported that she was being denied the opportunity to take quick breaks when she was experiencing low blood sugar levels, and that members of management had advised her that she needed to get her diabetes under control.

5

On October 29, 2012, following Boyd's conversations with Knobel, Bellofatto, and other female employees regarding Sellers' misconduct, Sellers was issued a "Review of Policy," which provided the following summary of his coworkers' complaints:

> Recently concerns regarding your behavior with a Team Member were brought to our attention. It was alleged that [you] made inappropriate comments to Team Members. These comments include "I would sleep with you; sometimes when I'm having sex I think of you; I want to lay down and taste you; and if money's a problem we can work something out." In addition it was alleged you continue to as[k] Team Members out even after they have told you no and have grabbed a Team Member by the hair and said I bet you like it when your boyfriend does this, and hit a Team Member on the butt with a serving tray. While you deny all these allegations, it is necessary to review appropriate behavior in the workplace, as well as review Red Robin's policies, procedures, standards and expectations.

Pl.'s Ex. 1, Docket No. 42. Sellers was advised that Red Robin expected that he show improvement in the areas outlined in the letter, and that failure to comply with company policies "may result in further disciplinary action up to and including termination." Id.

According to Bellofatto's evidence, Sellers continued to engage in the same conduct toward her and other female employees even after he was issued the Review of Policy. For instance, Bellofatto testified that Sellers "made comments to everyone, including [her] . . . [l]ike, 'Oh, wow, you look so fine today. Oh, you look so good today. Oh, you look so sexy today. Oh, I like it when your hair is like that, girl.'" Bellofatto Dep. 258. Bellofatto testified that Sellers made these comments "in a sexual manner," and that they were often accompanied by "some sort of licking face." Id. at 258-59. Bellofatto also testified that he continued to attempt to put his arm around her and touch her, and that she would have to push him away. Id. at 259.

Bellofatto likewise claims that her complaint to human resources regarding management's unwillingness to allow her to take breaks did not remedy the situation, and that Maranto confronted her in an "aggressive" manner after learning that she had spoken to human resources.

6

Id. at 200.   In late November 2012, Maranto pulled Bellofatto into his office and "yelled" at her.

Id.

> He was like, "What's this I hear about HR?   What's this I hear you're telling
> people?   What's this?   What's that?"   And he was like, "I need a specific
> example."   And I provided a few examples of times I had not [been given a break],
> you know.   Of course, I don't remember because it's been so long . . . . And he got
> very aggressive, very aggressive, very fast, very defensive, you know, and this is
> before I even get on the clock.   This is before my 13-hour double shift on Black
> Friday.   Yelling at me, saying I'm an emotional wreck who doesn't know how to
> control her disease, same old story he's been pulling, and that he's going to start
> cutting my hours if I don't control my disease better.

Id. at 200-01.   The following month, Bellofatto worked fewer hours and made several hundred
dollars less in tips.   Def.'s Ex. 35, Docket No. 32-35.

On February 22, 2013, another female server, Laura George, reported to management that
Sellers had been "making inappropriate jokes and touching her rear."   Pl.'s Ex. 5, Docket No.
43-2.   One of the managers indicated in the daily log that George's complaint was one of three
things that had given him a headache that day.   Id.   Although this complaint "should have been"
relayed to human resources, it was not.   Boyd Dep. 115, Docket No. 43-1.

That same month, Bellofatto began working at a bridal store in Roanoke, Virginia, and she
notified management that she was resigning from Red Robin.   During her deposition, Bellofatto
testified that she was "miserable" while working at the restaurant, both because of "the sexual
harassment from [Sellers]," and "the diabetes situation."   Bellofatto Dep. 254.   Bellofatto
worked her final shift at the restaurant on March 2, 2013.

On March 6, 2013, Laura George called human resources to report that Sellers was
sexually harassing her.   Two days later, she spoke to Kristy Boyd, who recorded the following
notes from their conversation:

> Phil [Sellers] makes sexual comments to her and she's told him to stop and he
> hasn't.   He's touched her stomach and her back.

7

Been going on since she first met him, probably January 2013. She doesn't usually work his shifts and now that she's changed her schedule she sees him.

He offered her friend, [Kourtni Knobel], $20 to curl her hair because [he thinks] it's sexy. Made her feel bad and he said it in front of everyone. He's loud and obnoxious about it. [Kourtni] is leaving and it's a deciding factor of her decision . . . .

Mentioned it to managers before – Matt, and he didn't do anything about it. When she talked with him about it there was another issue so she thinks he didn't really pay attention. Matt's not normally like that.

Those jeans your butt looks so good in that, so squishy. You go to the club wearing miniskirts showing that booty off. – comments he makes

Last week, last shift they worked together, he made the miniskirt comment.

Touching – he'll take his fingers and tries to pinch her stomach in a way to say hi. Happened recently within the last couple weeks. Back – last few weeks. His touch is very different, not just behind as they are walking by, he keeps his hand there longer and it's uncomfortable.

Witness – Alex Bellofatto and [Kourtni Knobel].

Pl.'s Ex. 3, Docket No. 42.

When Boyd called and talked to Bellofatto again, Bellofatto indicated that Sellers made "nonstop comments about [George's] ass and comments of her being so beautiful." Pl.'s Ex. 3, Docket No. 42. Bellofatto also advised Boyd that George had "talked with Matt [Pero] who said there's nothing they can do . . . about it," and "refused to help." Id.

On March 16, 2013, following the second complaint to human resources, Red Robin terminated Sellers' employment. When Maranto learned of the decision to terminate Sellers, he advised human resources that it was "going to be a big loss to the restaurant because guests absolutely love [Sellers]." Pl.'s Ex. 3, Docket No. 42.

8

## Procedural History

Bellofatto filed the instant action against Red Robin on April 10, 2014. In Count I of her complaint, Bellofatto claims that she was subjected to a hostile work environment because of her sex. In Count II, Bellofatto claims that Red Robin failed to reasonably accommodate her diabetes and discriminated against her on the basis of her diabetes. In Count III, Bellofatto claims that Red Robin retaliated against her for complaining about discriminatory treatment.

On November 28, 2014, Red Robin moved for summary judgment. The court held a hearing on the motion on December 10, 2014. The motion has since been fully briefed and is ripe for review.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-movant. Anderson, 477 U.S. at 255. To withstand a summary judgment motion, the non-movant must produce sufficient evidence from which a reasonable jury could return a verdict in her favor. Id. at 248.

## Discussion

### I.      Hostile work environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. 42 U.S.C. § 2000e-2(a)(1). Since an employee's work environment is a term or condition of employment, Title VII provides a cause of action for hostile work environment. EEOC v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001) (citing Meritor Sav.

9

Bank, FSB v. Vinson, 477 U.S. 57, 73 (1986)). To make out such a claim, a female plaintiff must demonstrate that "the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc). In moving for summary judgment on this claim, Red Robin argues that Bellofatto is unable to satisfy any of these elements. For the reasons that follow, however, the court is unpersuaded.

To satisfy the first element, Bellofatto must present sufficient evidence from which a reasonable jury could find that she was subjected to unwelcome harassment. As discussed above, Bellofatto's evidence indicates that she repeatedly told Sellers to stop touching her, and that she complained about his harassment to management and human resources. Based on this evidence, the court is convinced that a reasonable jury could find that the harassment was unwelcome. See Freeman v. Dal-Tile Corp., 750 F.3d 413, 420 (4th Cir. 2014) (holding that a reasonable jury could find that harassment was unwelcome where the employee complained to her supervisor, human resources, and the perpetrator himself).

To satisfy the second element, Bellofatto must show that a reasonable jury could find that the harassment was based on her sex. According to the evidence presented by Bellofatto, Sellers inappropriately touched her and other female employees; commented on her appearance, how "sexy" she looked, and how lucky her boyfriend was to have her; made remarks about other women's bodies and his desire to "do" or "taste" them; and expressed a desire to sleep with one of his female coworkers, emphasizing that he thought about her when he was having sex. While Red Robin argues that "Sellers hugged everyone" and "sometime[s] told crude jokes to male servers," Def.'s Reply Br. 13-14, Docket No. 51, the court is convinced that a reasonable jury could find that

Sellers' actions of a harassing nature were primarily directed toward women and, thus, that the harassment was based on Bellofatto's sex.   See, e.g., Beard v. Flying J, Inc., 266 F.3d 792, 798 (8th Cir. 2001) ("A plaintiff in this kind of case need not show . . . that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment.").

To satisfy the third element, Bellofatto must show that a reasonable jury could find that the sex-based harassment was so severe or pervasive as to alter the conditions of her employment and create an abusive or hostile atmosphere.  "This element of a hostile work environment claim has both subjective and objective parts."   Freeman, 750 F.3d at 421 (internal citation and quotation marks omitted).   Thus, Bellofatto "must show that [she] did perceive, and a reasonable person would perceive, the environment to be abusive or hostile."   Id.

At this stage of the proceedings, Red Robin does not challenge the sufficiency of the evidence with respect to the subjective portion of this element, and instead focuses on whether the harassment was objectively severe or pervasive.   As the United States Court of Appeals for the Fourth Circuit recently emphasized:

> This objective inquiry is not, and by its nature cannot be, a mathematically precise test.   Rather, when determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.   No single factor is dispositive, as the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

Id. at 421-22 (internal citation and quotation marks omitted).   Moreover, in determining whether the harassment was objectively severe or pervasive, "harassment directed towards other female employees is relevant and must be considered[,]" Sandoval v. Am. Bldg. Maint. Indus., 578 F.3d 787, 802 (8th Cir. 2009), even if it was not witnessed by the plaintiff herself.   See Ziskie v.

11

Mineta, 547 F.3d 220, 225 (4th Cir. 2008) (holding that the district court erred in rejecting evidence regarding conduct not witnessed by the plaintiff, and emphasizing that "evidence about how other employees were treated in that same workplace can be probative of whether the environment was indeed a sexually hostile one, even if the plaintiff did not witness the conduct herself").

Applying these principles, the court concludes that Bellofatto's proffered evidence creates a genuine issue of fact as to whether the sex-based harassment was objectively severe or pervasive. The record reveals that Sellers repeatedly engaged in unwanted physical contact during Bellofatto's tenure with Red Robin.    Soon after Bellofatto was hired, Sellers approached her from behind; grabbed her hair; and said, with his mouth close to her face, that he "'bet [she] like[d] it when [her] boyfriend pull[ed] her hair" like that.    Bellofatto Dep. 124.    Sellers also slapped Bellofatto on the buttocks with a serving tray, and "continually" tried to hug her and put his arm around her, even after she had told him not to touch her.    Id. at 128.    Likewise, Sellers "hu[gged] on" other female employees, including new hires, and touched them in a manner that they found uncomfortable.    See, e.g., Pl.'s Ex. 3, Docket No. 42 ("His touch is very different, . . . he keeps his hand there longer and it's uncomfortable.").

In addition to engaging in unwanted physical contact, Sellers regularly commented on Bellofatto's appearance and "how lucky [her] man [was] to have [her]," all in a "sexual manner." Bellofatto Dep. 143, 258; see also id. at 144 ("[T]he way he looked at me when he said those words, the body language that came across when he said those words, it was in a very sexual manner."); id. at 258 ("He made comments to everyone, including myself, that – he would say things . . . like, 'Oh, wow, you look so fine today.    Oh, you look so good today.    Oh, you look so sexy today.    Oh, I like it when your hair is like that, girl.'    Stuff like that, in a sexual manner . . . .

Just words or things to that effect . . . . But essentially mean the same thing. 'I think you look good,' some sort of crazy licking face."). Sellers also commented on other women's bodies; expressed a desire to sleep with and "taste" one of his female coworkers, and told that coworker that he thought about her when he was having sex. Along the same lines, Sellers asked another employee whether she was a virgin, and offered to "work something out," in a sexual manner, when Bellofatto indicated that she was struggling financially. Id. at 143-44.

In light of the sexual nature of Sellers' comments to Bellofatto and other female servers, the instances of unwelcome physical touching, and the fact that such conduct allegedly occurred on a frequent basis throughout Bellofatto's ten-month term of employment, the court concludes that Bellofatto has raised a triable issue as to whether the harassment was sufficiently severe or pervasive to alter the conditions of her employment. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . Such claims are based on the cumulative effect of individual acts."); see also Stewart v. MTR Gaming Group, Inc., 581 F. App'x 245, 246-47 (4th Cir. 2014) (holding that the plaintiff raised a genuine issue of material fact as to the duration, severity, and pervasiveness of inappropriate sexual comments and touching, where the plaintiff claimed that co-workers propositioned her, described sexual fantasies, and touched her on three occasions); Jennings v. Univ. of N.C., 482 F.3d 686, 698 (4th Cir. 2007) (concluding that a jury could reasonably find that two incidents of direct harassment of the plaintiff "were more abusive in light of the general, sexually charged environment" created by other inappropriate sexual conduct); O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001) (emphasizing that the "accumulated effect" of sexual remarks directed at women may be sufficient to support a jury verdict for a hostile work environment).

13

With respect to the final element, Bellofatto must establish a basis for imposing liability on Red Robin for the harassment. Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007). In cases involving harassment by a coworker, liability may be imposed on an employer "if it knew or should have known about the harassment and failed to take effective action to stop it." Ocheltree, 335 F.3d at 334. "Once the employer has notice, then it must respond with remedial action 'reasonably calculated to end the harassment.'" EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008) (quoting Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995)).

Applying these standards, the court concludes that a reasonable jury could find that Red Robin had notice of Sellers' sex-based harassment. The record reveals that Bellofatto and other servers repeatedly complained to assistant managers about Sellers, and that the restaurant's general manager was also aware of the harassment. When Bellofatto reported the serving tray incident to the assistant kitchen manager, he responded that he "had been continually trying to talk to Maranto and other people in management about the Phil [Sellers] issue, and nothing was done about it." Bellofatto Dep. at 104. Bellofatto also complained to other assistant managers about Sellers, "but [her complaints] just kind of got dismissed in general." Id. at 112. Likewise, Kourtni Knobel and Laura George complained to management multiple times before calling human resources, and Maranto acknowledged, in response to the first of those calls, that he had "heard things" about Sellers and that "some TMs [team members] ha[d] taken offense" to Sellers' behavior. Pl.'s Ex. 2 at 408, Docket No. 42. The court is convinced that such evidence is sufficient to create a triable issue as to whether Red Robin had knowledge of Sellers' harassment. See Sunbelt Rentals, 521 F.3d at 320 ("Evidence of repeated complaints to supervisors and managers creates a triable issue as to whether the employer had notice of the harassment.").

Case 7:14-cv-00167-GEC   Document 57   Filed 12/24/14   Page 14 of 23   Pageid#: 1068

The court likewise concludes that a reasonable jury could find that Red Robin did not respond with reasonable corrective action. According to the evidence presented by Bellofatto, Maranto did not take any corrective action in response to repeated complaints by female employees. Instead, it was not until a complaint was lodged directly with human resources that Sellers was issued a Review of Policy. Although this was a corrective step undertaken by Red Robin, a reasonable jury could find, in light of the frequency and severity of Sellers' misconduct, that it was not reasonably calculated to end the harassment, and that additional action was warranted. Indeed, Bellofatto's evidence reveals that Sellers continued to harass Bellofatto and other female employees even after the Review of Policy was issued, and that local management continued to ignore the problem. See, e.g., Boyd Dep. 115, Docket No. 43-1 (acknowledging that a complaint of inappropriate jokes and touching by Sellers should have been relayed to human resources). It was not until another employee complained directly to human resources, after receiving no assistance from management, that Sellers was finally terminated. Viewing the evidence in the light most favorable to Bellofatto, the court concludes that Red Robin's "'response was not sufficient on these facts to warrant summary judgment,'" and that "a rational jury could find that [Red Robin] 'failed to take additional action . . . reasonably calculated to end the harassment.'" EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 178 (4th Cir. 2009) (quoting Sunbelt Rentals, 521 F.3d at 320).

In sum, the court concludes that a rational jury could find that Bellofatto was subjected to an objectively hostile work environment based on sex, and that Red Robin knew of the harassment and failed to respond in a reasonable fashion. Accordingly, Red Robin is not entitled to summary judgment on Bellofatto's hostile work environment claim under Title VII.

15

## II.     Failure to accommodate

Bellofatto next claims that Red Robin violated the ADA by failing to reasonably accommodate her diabetes.   The ADA, as amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   "Such unlawful discrimination can include the failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . .'"   Wilson v. Dollar Gen. Corp., 717 F.3d 337, 344 (4th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)).   For purposes of the ADA, the term "reasonable accommodation" includes "job restructuring," "modified work schedules," and "other similar accommodations for individuals with disabilities."   42 U.S.C. § 12111(9)(B).   A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ."   42 U.S.C. § 12111(8).

Accordingly, in order to establish a prima facie case against an employer for failure to accommodate under the ADA, a plaintiff must show: (1) that she is an individual with a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that, with reasonable accommodation, she could perform the essential functions of the position; and (4) that the employer refused to make such accommodation.   Wilson, 717 F.3d at 345; see also Rhoads v. Fed. Deposit Ins. Corp., 257 F.3d 373, 387 n.11 (4th Cir. 2001).

In moving for summary judgment on this claim, Red Robin first challenges whether Bellofatto is disabled within the meaning of the ADA.   As the Fourth Circuit recently explained, "[t]he ADA provides three avenues for establishing the existence of a disability," one of which is

16

"a physical or mental impairment that substantially limits one or more major life activities of such individual." Young v. United Parcel Serv., Inc., 707 F.3d 437, 443 (4th Cir. 2013). The term "major life activities" is defined to include, among others, seeing, concentrating, thinking, and working, as well as "the operation of a major bodily function," including the "endocrine" system. 42 U.S.C. § 12102(2)(A) & (B). "While the ADA itself does not define the term 'substantially limited,' post-ADAAA regulations state that this standard 'is not meant to be a demanding [one],' and 'should not demand extensive analysis.'" Willoughby v. Conn. Container Corp., No. 3:11-CV-00992, 2013 U.S. Dist. LEXIS 168457, at *23-24 (D. Conn. Nov. 27, 2013) (quoting 29 C.F.R. § 1630.2(j)(1)(i) and (j)(1)(iii)). Pursuant to these regulations, "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," and any "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 29 C.F.R. § 1630.2(j)(1)(ii) and (j)(1)(vi).

In this case, Bellofatto has presented sworn testimony and medical documentation demonstrating that she suffers from Type 1 diabetes, which impacts the functioning of the endocrine system, and that she is required to take insulin multiple times a day to regulate her blood sugar levels. Bellofatto's evidence from her treating physician also indicates that she "runs the risk of impaired ability to think coherently, loss of cognitive ability, or unconsciousness" if her blood sugar levels fall too low. Pl.'s Ex 16, Docket No. 43-13. In light of such evidence, the court concludes that a reasonable jury could easily find that Bellofatto has "a physical impairment that substantially limits one or more major life activities of such individual," and, thus, is disabled for purposes of the ADA. 42 U.S.C. § 12102(1); see also Tadder v. Bd. of Regents of Univ. of Wis. Sys., 15 F. Supp. 3d 868, 884 n.9 (W.D. Wis. 2014) ("Post-ADAAA, the endocrine system is

17

expressly listed as a 'major bodily function' and its operation as a 'major life activity.' This would appear to generally establish diabetes as an impairment imposing a substantial limitation on a major life activity.") (internal citations omitted).

The court must also reject Red Robin's argument that it is entitled to summary judgment on the basis that Bellofatto did not provide adequate notice of her disability. As the Fourth Circuit has previously emphasized, "[t]he burden to provide notice is not an onerous one: the employee does not need to mention the ADA or use the phrase 'reasonable accommodation,' but need only inform the employer of both the disability and the employee's need for accommodations for that disability." Schneider v. Giant of Md., LLC, 389 F. App'x 263, 270 (4th Cir. 2010) (citing EEOC v. Fed. Express Corp., 513 F.3d 360, 369 (4th Cir. 2008)). According to Bellofatto's sworn deposition testimony, Bellofatto told Maranto during her interview that she has diabetes and that she occasionally needs to sit down and eat or drink something if her blood sugar levels are low. Bellofatto testified that Maranto acknowledged her request and indicated that it "would not be a problem." Bellofatto Dep. 149; see also id. at 158 ("I even mentioned . . . [that] 'at my old Red Robin, they would just either give me a basket of fries or give me some bread and I'd go sit down in the back for a few minutes.' And he was like, 'That's fair.'"). Although Pero was not present for the interview, Bellofatto testified that she also shared this information with him soon after she began working at the Christiansburg location. Id. at 153. While both Maranto and Pero deny these allegations, they are sufficient to create a triable issue of fact with respect to the issue of notice. See Germain v. Shearin, 531 F. App'x 392, 396 (4th Cir. 2013) (emphasizing that whether a sworn statement is true "is a credibility determination, which is properly resolved by a factfinder, not a 'judge ruling on a motion for summary judgment'") (quoting Anderson, 477 U.S. at 255).

Finally, the court must reject Red Robin's argument that it "never refused to provide

18

plaintiff with a reasonable accommodation." Def.'s Reply Br. 17, Docket No. 51. Once again, Bellofatto has presented sworn testimony and medical documentation demonstrating that her diabetes does not prevent her from working as long as it is properly treated, and that the only accommodation she requires is the opportunity to take a short break to eat or drink something to regulate her blood sugar levels. Bellofatto has also presented sworn deposition testimony indicating she was repeatedly denied the opportunity to take breaks, even though she was told during her interview that the need for breaks would not be a problem.

During her deposition, Bellofatto described one occasion on which Pero refused to allow her to take a break because she had not sold enough beverages, and she was forced to wait until another manager came on duty later that night. While Red Robin disputes Bellofatto's testimony, and attempts to characterize it as describing a single delayed break, Red Robin's arguments in this regard are contrary to the standards that must be applied at this stage of the proceedings, and ignore other portions of Bellofatto's sworn deposition testimony.[3]  Bellofatto indicated during her deposition that the foregoing incident was particularly memorable because of Pero's response to her request, and because of the physical effects that she subsequently experienced. See Bellofatto Dep. 170 (describing the incident as the first one with Pero that "st[uck] out like a sore thumb"); id. at 173-74 ("I was crying and shaking because I had low blood sugar."). She made clear, however, that this was not the only time that she was not allowed to take a short break to regulate her blood

---

[3] The court recognizes that Red Robin has proffered evidence from which a reasonable jury could discredit Bellofatto's testimony, including declarations from numerous employees. On summary judgment, however, "[i]t is not [this court's] job to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose [her], or to disregard stories that seem hard to believe." Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991). Instead, such credibility determinations are within the province of the jury. Id.; see also McCray v. Pee Dee Reg'l Transp. Auth., 263 F. App'x 301, 303 (4th Cir. 2008) ("Credibility determinations are improper on summary judgment; where resolution of an issue of fact depends upon such a determination, summary judgment is inappropriate.").

19

sugar levels, and that she was denied breaks on multiple occasions. See id. at 151 ("There were times when I would just ask, like, 'Hey, I really needed to order something and eat something. Can I do that?' It didn't matter. It was, "No, you've got tables. No, you need to get back on the floor. We'll phase you later. We'll deal with this later.") (emphasis added); Id. at 156 ("There were times I had low blood sugars and they wouldn't give me breaks.") (emphasis added); Id. at 165 ("It was just a passive/aggressive no and they would walk away."); Id. at 206 ("There's many times I asked . . . [I]t just got to the point where I'd ask and people would ignore me and say no. And it just got to the point where I just did whatever I had to do so I didn't pass out.") (emphasis added). Additionally, when Bellofatto would stop working long enough to "chug" a drink without permission, she would "get yelled at" by management. Id. at 153, 208.

Based on the foregoing evidence, the court concludes that a rational jury could find that Bellofatto requested a reasonable accommodation, that she could perform the essential functions of her job with such accommodation, and that Red Robin refused to provide the accommodation on multiple occasions. Accordingly, Red Robin's motion for summary judgment will be denied with respect to this claim.

## III. Disability discrimination

Bellofatto also claims that Red Robin discriminated against her on the basis of her diabetes by cutting her hours and giving her less profitable shifts. To establish a claim for disability discrimination, a plaintiff must demonstrate: (1) that "she had a disability as defined in the ADA"; (2) that "she was a 'qualified individual,' which entails being able to perform the essential functions of her job"; and (3) that her employer "took an adverse action against her on account of her disability." Young, 707 F.3d at 443. "An adverse employment action is a discriminatory act which 'adversely affect[s] the 'terms, conditions, or benefits' of [a plaintiff's] employment."

20

James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (quoting Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001)). The "typical" examples are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion . . . ." Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999).

For the reasons set forth above, the court concludes that a jury could find that Bellofatto was disabled within the meaning of the ADA, and that she was capable of performing the essential functions of her job. While Red Robin argues that the claim nonetheless fails because it did not take any adverse action against her, the court concludes that a reasonable jury could find that Red Robin reduced Bellofatto's hours because of her disability. See Menzie v. Ann Taylor Retail, Inc., 549 F. App'x 891, 894 (11th Cir. 2013) ("[Plaintiff] is correct that a non-trivial reduction in work hours may qualify as an adverse employment action."). According to Bellofatto's sworn deposition testimony, Maranto expressly stated in late November of 2012 that she did not know how to handle her diabetes, and that he was "going to start cutting [her] hours if [she did not] control [her] disease better." Bellofatto Dep. 200-01. Bellofatto further testified that her hours were, in fact, cut. Bellofatto's testimony is corroborated by Red Robin's employment records, which indicate that, during the month following her conversation with Maranto, Bellofatto worked over 50 fewer hours and made several hundred dollars less in tips than she did in November. Def.'s Ex. 35, Docket No. 32-35. While Red Robin suggests that this was likely due to restaurant traffic being lower over Christmas, this assertion is contradicted by Bellofatto's sworn deposition testimony. See Bellofatto Dep. 223 ("December was pretty busy, because even though a lot of students are home, it was still the holiday season. People are out shopping . . . . Christmastime is pretty busy in Christiansburg.").

Based on the foregoing evidence, which must be viewed in Bellofatto's favor at this stage

21

of the proceedings, the court concludes that a reasonable jury could find that Red Robin took an adverse action against Bellofatto on account of her disability. Accordingly, Red Robin's motion for summary judgment will be denied with respect to this claim.

### IV.    **Retaliation**

In her final claim, Bellofatto asserts that Red Robin retaliated against her for complaining about being denied breaks to regulate her blood sugar levels. In addition to prohibiting discrimination on the basis of disability, the ADA also prohibits employers from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA]." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation under the ADA, a plaintiff must show (1) that she engaged in a protected activity; (2) that her employer acted adversely against her, and (3) that there was a causal connection between the protected activity and the employer's adverse action. Rhoads, 257 F.3d at 392.

In moving for summary judgment on this claim, Red Robin does not dispute that Bellofatto engaged in protected activity by complaining about discriminatory treatment. Instead, Red Robin once again argues that Bellofatto has failed to show that she suffered any adverse action following her complaints. For the same reasons set forth above, however, the court is unable to agree. It is undisputed that Bellofatto complained to human resources in October of 2012 that she was being denied breaks to regulate her blood sugar levels. In November of 2012, upon learning about her complaint, David Maranto yelled at her for speaking to human resources and told her that he was going to start cutting her hours if she did not properly manage her diabetes. At this stage of the proceedings, the court is convinced that Bellofatto's sworn account of Maranto's comments, combined with the records demonstrating that she subsequently worked fewer hours and made less money, constitutes sufficient evidence to permit a reasonable jury to find that Bellofatto

22

was the victim of unlawful retaliation.

## Conclusion

For the reasons stated, Red Robin's motion for summary judgment will be denied.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This __24th__ day of December, 2014.

_Glen Conrad_

Chief United States District Judge

Case 7:14-cv-00167-GEC   Document 57   Filed 12/24/14   Page 23 of 23   Pageid#: 1077